

SO ORDERED,

**Judge Edward Ellington**
**United States Bankruptcy Judge**
**Date Signed: May 21, 2015**

The Order of the Court is set forth below. The docket reflects the date entered.

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:                                                              **CHAPTER 13**
**PATRICIA L. SMITH**                              **CASE NO. 1301920EE**

Hon. Robert L. Spotswood                              Attorney for Debtor
lawfirm218.agj@att.net
Post Office Box 180118
Richland, MS  39218

Hon. William H. Leech                    Attorneys for Trustmark National Bank
bleech@cctb.com
Hon. Timothy J. Anzenberger
tanzenberger@cctb.com
Post Office Box 6020
Ridgeland, MS  39158

Hon. James L. Henley, Jr.                              Chapter 13 Trustee
jlhenley@jlhenleych13.net
Post Office Box 31980
Jackson, MS  39286

Hon. Catoria Martin                    Attorney for Chapter 13 Trustee
cmartin@jlhenleych13.net
Post Office Box 31980
Jackson, MS  39286

Edward Ellington, Judge

## MEMORANDUM OPINION

**THIS MATTER** came before the Court for the trial on the (1) *Motion to Convert Under 11 U.S.C. § 1307(C) (sic)* (Dkt. #142) filed by Trustmark National Bank; (2) *Memorandum in Opposition to Trustmark National Bank's Motion to Convert Under 11 U.S.C. § 1307(C) (sic)* filed by Patricia L. Smith (Dkt. #192)[1]; (3) *Motion to Dismiss Case Under Section 1307(b)* (Dkt. #144) filed by Patricia L. Smith; and (4) *Response to Motion to Dismiss Case Under Section 1307(B) (sic)* (Dkt. #152) filed by Trustmark National Bank.  Having considered same, the evidence presented at trial, and the respective briefs filed by the parties, the Court finds that Patricia L. Smith's *Motion to Dismiss Case Under Section 1307(b)* (Dkt. #144) should be denied and that Trustmark National Bank's *Motion to Convert Under 11 U.S.C. § 1307(C) (sic)* (Dkt. #142) should be granted.

## FINDINGS OF FACT[2]

On January 29, 2013, Patricia L. Smith (Debtor) filed a petition for relief under Chapter 13 of the United States Bankruptcy Code (First Petition).  The First Petition was assigned case number 13-00238EE.  Robert L. Spotswood was her attorney, and Harold J. Barkley, Jr. was her Chapter 13 Trustee.  In her *Summary of Schedules* (Schedules 1), the Debtor lists her secured debt as

---

[1] This pleading was filed by Mrs. Smith as a responsive pleading to the *Motion to Convert Under 11 U.S.C. § 1307(C) (sic)* (Dkt. #142) filed by Trustmark National Bank.  It is also Mrs. Smith's memorandum in opposition to the motion.  Since it was filed well outside of the twenty-one (21) day response time (*see* Dkt. No. 143), Trustmark National Bank filed a motion to strike the memorandum as being untimely filed.  The Court ultimately denied the motion to strike and allowed Mrs. Smith's response/memorandum to remain of record.

[2] These proposed findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.  To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law.  To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

$2,197,216.60 (Schedule 1-D) and her unsecured debt (Schedule 1-F) as $6,781.00.

On April 10, 2013, Mr. Barkley filed a *Notice and Motion to Dismiss* because the Debtor was behind in her plan payments in the amount of $19,161.00. On May 9, 2013, an *Agreed Order* was entered granting the Chapter 13 Trustee's *Notice and Motion to Dismiss.*

A little more than two (2) months after her First Petition case was dismissed, the Debtor filed the above-styled Chapter 13 case on June 21, 2013 (Second Petition). James L. Henley, Jr. was appointed the Debtor's Chapter 13 Trustee (Trustee). At the time she filed her petition, Mr. Spotswood was once again her attorney of record.[3] In her *Summary of Schedules* (Dkt. #11) (Schedules), the Debtor lists her secured debt as $1,841,716.60 (Schedule D) and her unsecured debt as $68,083.61.

On *Amended Schedule D – Creditors Holding Secured Claims* (Dkt. #24) (Amended Schedule D), the Debtor lists ten (10) separate pieces of real property. Trustmark National Bank (Trustmark) is listed as having a mortgage in the amount of $425,000.00. A piece of real property located in Santa Rosa Beach, Florida, is listed as the security for Trustmark's mortgage.

On January 27, 2014, the Debtor filed another *Amended Schedule D – Creditors Holding Secured Claims* (Dkt. #110-1) ( Second Amended Schedule D). On Second Amended Schedule D, Trustmark is again listed with a secured claim for $425,000.00, however, Trustmark's claim was amended to state that the nature of the lien was a "Mortgage/Personal Guarantor Only."[4]

---

[3]As discussed later in this Opinion, the Debtor has had other attorneys representing her in addition to Mr. Spotswood. Mr. W. Jeffery Barnes of Boca Raton, Florida, and Mr. James G. McGee, Jr. of Jackson, Mississippi, both represented the Debtor in the Second Petition. At different times during the case, both attorneys withdrew from their representation of the Debtor.

[4]*Amended Schedule D – Creditors Holding Secured Claims*, Case No. 1301920EE, Dkt. #110-1, p. 1, January 27, 2014.

On July 15, 2013, W. Jeffrey Barnes filed a *Motion for Admission to Practice Pro Hac Vice in the U.S. Bankruptcy Court for District of Mississippi (sic)* (Dkt. #30). An order granting the motion was eventually entered on August 1, 2013. In the meantime, Mr. Barnes filed an *Adversary Complaint*[5] (Trustmark Adversary) against Trustmark on July 17, 2013. Generally, in the Trustmark Adversary, the Debtor alleged that Trustmark violated 11 U.S.C. § 362(k)[6] when it conducted a judicial foreclosure of real property located in Santa Rosa Beach, Florida, owned by Stone Source, a Granite and Marble Company, Inc. (Stone Source), the Debtor's wholly owned corporation. On June 18, 2014, an *Agreed Final Judgment of Dismissal With Prejudice* was entered dismissing the Trustmark Adversary.

On November 12, 2013, Trustmark filed two (2) separate *Proofs of Claim*. Claim Number 4-1 is for an unsecured debt which is based upon the Debtor's personal guaranty. Claim 4-1 was filed in the amount of $816,905.12. Claim 5-1 is a secured debt[7] which is secured by real property located in Defuniak Springs, Florida. Claim 5-1 was filed in the amount of $64,610.66.

The Debtor filed a *Motion to Amend Chapter 13 Plan* (Dkt. #106) (Motion to Amend) on January 27, 2014. In her Motion to Amend, the Debtor states:

> 3. Debtor has amended Schedule A and Schedule D. Debtor was incorectly identified as a party responsible for certain secured debts, but in actuality, was either only on the deed or had a statutory interest (homestead). Debtor's secured debt totals $965,528.00. Debtor's unsecured and priority claims total $322,815.00. Debtor is also amending the Chapter 13 Plan to pay all unsecured creditors 100% (in full).

---

[5]Adversary No. 1300058EE.

[6]Hereinafter, all code sections refer to the Bankruptcy Code found at Title 11 of the United States Code unless specifically noted otherwise.

[7]Both debts were originally between the Debtor and BankTrust. At some point, Trustmark became the successor-in-interest to BankTrust by merger. For purposes of this Opinion, BankTrust will be referred to as Trustmark.

4.  Debtor is now desirous to amend her Chapter 13 Plan to surrender the following real property to the mortgagors:

    a.  3750 Hwy 1 South, Greenville MS  38701
    b.  4251 Henderson Avenue, Pass Christian, MS  39571
    c.  Fable Street, Meraux, LA, Vacant Lot
    d.  Chotard Landing Resort, 29C Chotard Landing Road, Vicksburg, MS 39184
    e.  2806 Front Street, Pascagoula, MS  39568, Parcel #41360266.000 Lot Only

5.  The amendment to the Chapter 13 Schedules causes the secured claims of the Debtor, as well as the unsecured debts of the Debtor, to be within the jurisdictional limitations of Chapter 13.[8]

The Debtor noticed out the Motion to Amend to all creditors for twenty-one (21) days.  Trustmark filed its *Objection to Motion to Amend Chapter 13 Plan* (Dkt. #123).  Trustmark alleges that contrary to what is stated in the Motion to Amend, Trustmark has an unsecured claim well in excess of the $383,175.00 debt limits, and therefore, the Debtor is not eligible to be a debtor under Chapter 13.  The Trustee filed *Trustee's Objection to Debtor's Motion to Amend Plan (Dkt. #106)* (Dkt. #126).  In his objection, the Trustee also alleges that the Debtor is not eligible to be a debtor under Chapter 13 because on the date the Debtor filed her Second Petition, the Debtor exceeded the debt limits.  The Trustee further states that without strict proof evidencing the ownership of the properties being abandoned and the properties being retained, the Debtor's Motion to Amend should be denied.  The Motion to Amend and the objections were set for trial for April 4, 2014.

During this time period, James G. McGee, Jr. entered his appearance on behalf of the Debtor in the Trustmark Adversary (see Adv. Dkt. #39).  On April 3, 2014, Mr. McGee filed his *Disclosure of Compensation of Attorney for Debtor(s)* (Dkt. #139) in the main bankruptcy case.

---

[8] *Motion to Amend Chapter 13 Plan,* Case No. 1301920EE, Dkt. #106, p. 1, January 27, 2014.

The Trustee filed *Trustee's Motion to Dismiss* (Dkt. #133) (Trustee's Motion to Dismiss) on March 5, 2014. In the Trustee's Motion to Dismiss, the Trustee alleges that the Debtor's case should be dismissed under several grounds. First the Trustee alleges that the Debtor's case should be dismissed because pursuant to § 109(e) the Debtor did not qualify to be a debtor under Chapter 13 because "[o]nly an individual with regular income that owes, on the date of the filing of the petition . . . unsecured debts of less than $383,175.00 and secured debts of less than $1,149,525.00 . . . may be a debtor under chapter 13 of this title. (emphasis added)"[9] According to the Debtor's Schedules, at the time she filed her bankruptcy petition, she listed secured debt in the amount of $1,841,716.60. The Trustee further alleged that "[t]he total unsecured debt incurred prior to the petition date and filed to date is $818,601.17."[10] The Trustee's Motion to Dismiss was set for trial on April 4, 2014, with the Motion to Amend.

A few days before the trial on the Motion to Amend and the Trustee's Motion to Dismiss, the Debtor filed a *Motion for Continuance* (Dkt. #137) of the April 4, 2014, trial due to the health of the Debtor's mother-in-law. The trial was continued to a later date. The Trustee's Motion to Dismiss was reset, however, the Motion to Amend and the objections were never reset for a preliminary hearing or a trial. The Motion to Amend and the objections are still pending.

On April 7, 2014, Trustmark filed its *Motion to Convert Under 11 U.S.C. § 1307(C) (sic)* (Dkt. #142) (Motion to Convert). In its Motion to Convert, Trustmark alleges that the Debtor's case should be converted for cause because the Debtor failed to disclose assets and failed to disclose $357,644.48 in litigation settlement proceeds which were paid to the Debtor's wholly owned

---

[9]*Trustee's Motion to Dismiss,* Case No. 1301920EE, Dkt. #133, p. 1, March 5, 2014.

[10]*Id.*

6

corporation, Stone Source.  Some four (4) months after Trustmark filed its Motion to Convert, the Debtor filed her *Memorandum in Opposition to Trustmark National Bank's Motion to Convert Under 11 U.S.C. § 1307(C) (sic)* (Dkt. #192) (Memorandum Opposing Conversion).

The next day, on April 8, 2014, the Debtor filed a *Motion to Dismiss Case Under Section 1307(b)* (Dkt. #144) (Motion to Dismiss).  In her Motion to Dismiss, the Debtor asserts that she wants her Chapter 13 case dismissed because she "is no longer able to comply with her Chapter 13 plan and does not desire to modify the plan."[11]  The Debtor further states that pursuant to § 1307(b), the "debtor is entitled to have this Chapter 13 case dismissed at any time."[12]

Trustmark filed its *Response to Motion to Dismiss Case Under Section 1307(B) (sic)* (Dkt. #152) (Response).  In its Response, Trustmark cites case law from the Court of Appeals for the Fifth Circuit and case law from this Court which hold that a debtor does not have an absolute right to dismiss his/her case if the debtor has acted in bad faith.  Trustmark asserts that the Debtor has acted in bad faith, and therefore, her case should be converted to a Chapter 7 and not dismissed.

Over the next seven (7) months, various pleadings were filed by the parties:  motions to quash subpoenas; motions to continue 2004 examinations; a motion to withdraw as Debtor's attorneys by McGee and Spotswood (which was later withdrawn); motions to continue hearings and trials; a motion by Mr. McGee to withdraw as attorney for the Debtor (which was granted); and a motion to examine attorney fees– just to name a few of the pleadings filed by the parties.

Eventually, on January 8, 2015, a trial was held on the Trustee's Motion to Dismiss, the

---

[11]*Motion to Dismiss Case Under Section 1307(b),* Case No. 1301920EE, Dkt. #144, p. 1, April 8, 2014.

[12]*Id.*

7

Motion to Convert filed by Trustmark, and the Motion to Dismiss filed by the Debtor. At the trial, the Trustee announced that he would withdraw the Trustee's Motion to Dismiss. At the conclusion of the trial, the parties were instructed to submit a briefing schedule. The Court then took the matters under advisement.

## CONCLUSIONS OF LAW

### I. Jurisdiction

This Court has jurisdiction of the subject matter and of the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(1) and (2)(A) and (O).

### II. Motion to Dismiss

Section 1307 provides for the conversion or dismissal of a Chapter 13 case. Section 1307 provides in pertinent part:

> § 1307.   Conversion or Dismissal
>
>         . . . .
>
> > (b)  On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter. Any waiver of the right to dismiss under this section is unenforceable.

11 U.S.C. § 1307(b).

As noted above, the Debtor states in her Motion to Dismiss that pursuant to § 1307(b), she is "entitled to have this Chapter 13 case dismissed at any time."[13] Citing *In re Seneca McField*[14]

---

[13]*Motion to Dismiss Case*, Dkt. #144 at p. 1.

[14]*Findings of Fact and Conclusions of Law on the Motion to Convert to Chapter 7 filed by Regions Bank and the Motion to Voluntarily Dismiss Chapter 13 Filed by the Debtor, In re Seneca*

8

and *In re Jacobsen,*[15] Trustmark asserts that the Debtor does not have an absolute right to dismiss her case. For the reasons expressed below, the Court agrees with Trustmark.

In *In re Seneca McField*, this Court also had before it a creditor's motion to convert, and the debtor's motion to voluntarily dismiss his Chapter 13 case. Without precedent in the Fifth Circuit, this Court found *Molitor v. Eidson (In re Molitor),* 76 F.3d 218 (8th Cir. 1996) to be persuasive. Following *Molitor*, the Court found that a debtor does not have an absolute right to dismiss his case when a motion to convert is pending or when there are allegations of bad faith or fraud.

Subsequently, in *In re Jacobsen,* the Fifth Circuit was faced with an identical set of facts as in *McField* and as is before this Court in the case at bar. In *Jacobsen,* a party filed a motion to convert, and in response, the debtor filed a motion to voluntarily dismiss.

Jacobsen filed a petition for relief under Chapter 13 of the bankruptcy code. With the help of angry creditors who alleged that Jacobsen had defrauded them, the Chapter 13 trustee uncovered that Jacobsen's schedules were replete with misrepresentations, errors, and undisclosed fraudulent transfers. The trustee moved to convert the case to a Chapter 7 pursuant to § 1307(c). Jacobsen then moved to dismiss his case pursuant to § 1307(b). In denying Jacobsen's motion to dismiss, the bankruptcy court found that Jacobsen had acted in bad faith and abused the bankruptcy process. The bankruptcy court converted the case to a Chapter 7. The district court affirmed the conversion of Jacobsen's case to a Chapter 7. Jacobsen appealed to the Fifth Circuit.

After reviewing the split in the circuits and in bankruptcy courts, the Fifth Circuit addressed the United States Supreme Court's opinion in *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 127

_____

*McField*, Case No. 0601659EE, Dkt. #124, March 8, 2007.

[15]*Jacobsen v. Moser (In re Jacobsen),* 609 F.3d 647 (5th Cir. 2010).

9

S.Ct. 1105, 166 L.Ed.2d 956 (2007).  In *Marrama,* the debtor filed a Chapter 7.  His schedules were inaccurate and misleading.  When the Chapter 7 trustee informed the debtor that he would be seeking to recover assets for the benefit of the estate, the debtor filed a motion to convert his case to a Chapter 13 pursuant to § 706(a).  The Supreme Court found that § 706(a) was subject to an exception for bad faith.

In affirming the conversion, the Fifth Circuit followed the Supreme Court's decision in *Marrama,* and held "that a bankruptcy court has the discretion to grant a pending motion to convert for cause under § 1307(c) where the debtor has acted in bad faith or abused the bankruptcy process and requested dismissal under § 1307(b) in response to the motion to convert."[16]

Applying the Fifth Circuit's holding in *Jacobsen* to the case at bar, the Court finds that the facts are comparable, and therefore, the Debtor does not have an absolute right to dismiss her case because Trustmark's Motion to Convert was filed before the Debtor filed her Motion to Dismiss.  Consequently, the Court must determine whether the Debtor "has acted in bad faith or abused the bankruptcy process"[17] before ruling on the Debtor's Motion to Dismiss.

## II. Motion to Convert

Section 1307(c) provides for the conversion or dismissal of a Chapter 13 bankruptcy case.  Section 1307(c) provides in pertinent part:

§ 1307 Conversion or Dismissal.

. . . .

(c) Except as provided in subsection (f) of this section, on request of

[16]*In re Jacobsen*, 609 F.3d  at 660 (footnote omitted).

[17]*Id.*

10

> a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause. . . .

11 U.S.C. § 1307(c).

In addressing the question of conversion under § 1307(c), the Fifth Circuit in *Jacobsen* once again looked to *Marrama* for guidance.  The Fifth Circuit found:

> The *Marrama* Court, interpreting § 1307(c)'s dismissal provision, declined to "articulate with precision what conduct qualifies as 'bad faith,'" instead noting that the debtor's conduct must be "atypical" and that bad faith occurs only in "extraordinary cases." *Marrama,* 549 U.S. at 375 n. 11, 127 S.Ct. 1105.  The Court found that such an extraordinary and atypical case was before it where the debtor attempted to conceal an asset by filing "misleading or inaccurate" schedules. *Id.* at 368, 371, 127 S.Ct. 1105.  Because Jacobsen filed misleading and inaccurate schedules that attempted to conceal assets from creditors, he is clearly among the class of atypical debtors subject to the limited exception to § 1307(b).  In light of Jacobsen's bad faith and the pending motion to convert to Chapter 7, we conclude that it was within the bankruptcy court's discretion to deny Jacobsen's motion to dismiss his Chapter 13 case under § 1307(b) and to order conversion under § 1307(c) instead.[18]

Using *Marrama* and *Jacobsen* as guidance, the Court must now look to the facts of this case to determine if the case before it is an *extraordinary case* where the Debtor's conduct was *atypical* and resulted in bad faith.

"In this circuit, courts apply a "totality of the circumstances" test to determine whether a Chapter 13 petition and plan are filed in good faith[19]. . . .one of the factors a court should consider in applying the totality of the circumstances test is 'whether the plan shows an attempt to abuse the

---

[18]*Id.* at 662-63.

[19]*See Suggs v. Stanley* (*In re Stanley*), 224 Fed. Appx. 343, 346 (5th Cir.2007) (per curiam) (unpublished) (citing *In re Chaffin,* 816 F.2d 1070, 1073 (5th Cir. 1987), *modified, In re Chaffin,* 836 F.2d 215, 216–17 (5th Cir. 1988)).

11

spirit of the bankruptcy code."[20]  However, upon a review of the case law in this circuit, that is only

one of at least seven (7) factors used by courts in this circuit:

> With respect to good faith, a totality of the circumstances test is used to determine
> whether a chapter 13 plan has been proposed in good faith, as required by 11 U.S.C.
> § 1325(a)(3). *In re Stanley,* 224 Fed.Appx. 343, 346 (5th Cir. 2007). Good faith
> factors include: "(1) the reasonableness of the proposed repayment plan; (2) whether
> the plan shows an attempt to abuse the spirit of the Bankruptcy Code; (3) whether
> the debtor genuinely intends to effectuate the plan; (4) whether there is any evidence
> of misrepresentation, unfair manipulation, or other inequities; (5) whether the filing
> of the case was part of an underlying scheme of fraud with an intent not to pay; (6)
> whether the plan reflects the debtor's ability to pay; and (7) whether a creditor has
> objected to the plan. *Id.* "In applying this test, the bankruptcy court 'exacts an
> examination of all of the facts in order to determine the bona fides of the debtor.'"
> *Id.* (*citing, In re Chaffin,* 816 F.2d 1070, 1073 (5th Cir.1987)).

*In re Resendiz,* No. 12-10603, 2013 WL 6152921, at *4 (Bkrtcy. S.D. Tex. Nov. 20, 2013).

In order to prevail on its Motion to Convert under a § 1307, the burden is on Trustmark to

show that the Debtor lacked good faith.  *Matter of Love,* 957 F.2d 1350, 1355 (7th Cir. 1992).

In its Motion to Convert, Trustmark alleges that the Debtor exceeded the debt limits under

§ 109(e) on the day the petition was filed, and therefore, does not qualify to be a debtor under

Chapter 13; that the Debtor filed her petition in an attempt to halt the judicial foreclosure sale of

Stone Source's property in Florida; and that the Debtor failed to disclose substantial assets.

## A.  Debt Limits

Pursuant to § 109(e) in order to qualify to be a debtor under Chapter 13 "[o]nly an individual

with regular income that owes, on the date of the filing of the petition . . . unsecured debts of less

than $383,175.00 and secured debts of less than $1,149,525.00 . . . may be a debtor under chapter

13 of this title."  11 U.S.C. § 109(e).

---

[20]*Sikes v. Crager (In re Crager),* 691 F.3d  671, 675 (5th Cir. 2012) (footnote omitted).

The Debtor's Schedules were filed on July 3, 2013, and clearly state that the Debtor had secured claims of $1,841,716.60 which exceeds the $1,149,525.00 limit of § 109(e).  *See Summary of Schedules*, Dkt. 11, July 3, 2013.

### B.  Debtor's Attempt to Halt Foreclosure

As noted above, Trustmark was not attempting to foreclose on property owned by the Debtor. Rather, Trustmark was attempting to foreclose on property located in Florida which was owned by Stone Source.  Florida is a judicial foreclosure state.  Trial Exhibit 13 is a composite exhibit of documents filed in Trustmark's judicial foreclosure action in the circuit court in Walton County, Florida.  On April 23, 2013, the state judge issued its *Final Summary Judgment* granting Trustmark request to foreclose on Stone Source's property.  The judgment further stated that the foreclosure sale was to take place on June 24, 2013.

As Trial Exhibit 13 shows, Stone Source, the Debtor and her husband, Rodney Woodruff, (Woodruff) then filed various pleadings in their attempts to halt the foreclosure sale.  Essentially in their pleadings, they argued to the Florida court that because Patricia Smith owned Stone Source, her individual bankruptcy filing should halt the foreclosure sale on Stone Source's property.[21]

### C.  The Debtor's Schedules

Trustmark alleges that the Debtor's schedules are inaccurate.  Trustmark alleges that the Debtor attempted to defraud her creditors by alleging property that she had previously listed in her First Petition as being unencumbered, were now encumbered with deeds of trust in favor of her

---

[21]*See* Trial Exhibit 13, *Motion of Patricia L. Smith and Stone Source a Granite and Marble Company, Inc. To Vacate Final Summary Judgment Pursuant to Fla. R. Civ. P. 1.540(b), to Cancel June 24, 2013, Foreclosure Sale, and for Sanctions*, May 16, 2013; *Notice of Appeal*, May 21, 2013; *Suggestion of Bankruptcy*, August 15, 2013; and Rodney A. Woodruff's *Motion to Set Aside/Vacate Default and Final Summary Judgment of Foreclosure*, February 28, 2014.

husband.  Trustmark further alleges that the Debtor failed to disclose checking accounts; that she failed to disclose rental income she had received; and that she failed to disclose funds she received from the settlement of a lawsuit.

### 1.  Deeds of Trust

In her First Petition, the Debtor lists three pieces of property on *Schedule A – Real Property* (Schedule 1-A) as unencumbered:  Pass Christian Lot, Pascagoula Lot, and Fable Street Lot.  Since the Debtor stated that these pieces of property were unencumbered, these three pieces of property are not listed on *Schedule D – Creditors Holding Secured Claims* (Case 1300238EE; Dkt. #3).

In the Schedules filed with her Second Petition, the Debtor states on *Schedule A – Real Property* (Schedule A), that all three pieces of property are encumbered.  Amended Schedule D[22] lists that Woodruff holds a secured claim in the Pass Christian Lot and the Fable Street Lot for $25,000.00 each.  Amended Schedule D states that Woodruff holds a secured claim on the Pascagoula Lot for $125,000.00.

The charts below show the differences in the secured claims of Woodruff on the two sets of schedules filed by the Debtor:

See Next Page

---

[22]The Debtor has filed at least three different versions of *Schedule D – Creditors Holding Secured Claims*.  The first Schedule D was filed on July 3, 2013, (Dkt. #11-4), and when compared to the other two versions, the first Schedule D appears to be missing the first page.  Amended Schedule D (Dkt. #24) was filed on July 11, 2013.  Then on January 27, 2014, the Debtor filed another version of Schedule D (Dkt. #110-1) which only deals with Trustmark.  For purposes of the discussion regarding the Woodruff deeds of trust, the Court will refer to Amended Schedule D (Dkt. #24).

| FIRST PETITION – SCHEDULE D<br>SECURED CLAIMS OF RODNEY WOODRUFF | | |
|---|---|---|
| **Property** | **Lien Holder** | **Amount** |
| Greenville<br>Hwy. 1 S. | Rodney Woodruff | $175,000.00 |
| Chotard<br>Chotard Landing | Rodney Woodruff | $78,500.00 |

*Schedule D – Creditors Holding Secured Claims,* Case No. 1300238EE, Dkt. #3, p. 10, January 29, 2013.

| SECOND PETITION – SCHEDULE D<br>SECURED CLAIMS OF RODNEY WOODRUFF | | |
|---|---|---|
| **Property** | **Lien Holder** | **Amount** |
| Greenville<br>Hwy. 1 S. | Rodney Woodruff | $175,000.00 |
| Pass Christian<br>Henderson Ave. | Rodney Woodruff | $25,000.00** |
| Meraux, LA<br>Fable St. | Rodney Woodruff | $25,000.00** |
| Chotard<br>Chotard Landing | Rodney Woodruff | $78,500.00 |
| Pascagoula<br>Front St. | Rodney Woodruff | 125,000.00** |

*Amended Schedule D – Creditors Holding Secured Claims,* Case No. 1301920EE, Dkt. #24, p. 1-2, July 11, 2013.[23]

The Court notes that while the Debtor's *Amended Schedule D – Creditors Holding Secured Claims* (Dkt. #24) shows that Rodney Woodruff has a deed of trust for $25,000.00 on the Meraux, Louisiana, Fable St., property, this alleged deed of trust was not introduced into evidence at trial

---

[23]** changes from First Petition.

because it was never produced to Trustmark. (Transcript at 25-6). In her Federal Rule of

Bankruptcy Procedure 2004 Examination[24] (2004 Exam), Trustmark's attorney told the Debtor that

the deed of trust on the Fable Street property was not produced to Trustmark. The Debtor was then

asked if a deed of trust on the property existed. The Debtor answered: "It should be, yes." Trial

Exhibit 1, *Rule 2004 Exam of Patricia L. Smith,* p. 33.

At the trial, the Debtor was questioned extensively about the differences in her two schedules

regarding the real property she owned. With regard to the deeds of trust held by her husband, the

Debtor testified that she executed the deeds of trust because her husband had loaned her money. She

further testified that there were no written loan documents for any of the loans and that she was

unaware of what any of the money her husband had given to her was for.[25]

When asked why the deeds of trust were not disclosed in Schedules 1, the Debtor answered:

Q. In the first schedules there is no lien, correct?

A. Well that's what it's saying. But can I explain something on this right here?

      . . . .

A. – when I filed the first bankruptcy I mean it was, you know, because I was being
pressured so much about – from the bank and everything. So I just, you know, called
several attorneys and then I ended up getting [Mr. Spotswood] and I just told him
whatever, you know, he asked for. And so anyway I just told him whatever I thought
he needed and I didn't know anything about bankruptcy, don't know one thing about
bankruptcy. But anyway so that's what I told him. And then after, you know, I
guess a few weeks or whatever it was after the filing I seen that it was a bunch of
discrepancies in this. So I went back to [Mr. Spotswood] and talked to [Mr.
Spotswood] and, you know, I said, you know, you know, it was so many
discrepancies that we just decided to stop that bankruptcy there, you know, and, you
know, get everything however we needed it to be, you know, get all the documents,

---

[24]Hereinafter, all rules refer to the Federal Rules of Bankruptcy Procedure unless specifically
noted otherwise.

[25]Transcript at 20-26.

the correct documents and everything together.

Q.  So the first bankruptcy was dismissed because of the errors that were in the schedules?

A.  Well, yeah, because I didn't give him I mean when I went back and started looking at the schedules, you know, I mean [Mr. Spotswood] didn't have all the information that should have been.  And some of it, a lot of it was my fault but, you know some errors on his office.

Transcript at 17-19.

As to whether she had reviewed and signed Schedules 1 before they were filed, the Debtor's answer varied.  When asked at trial if she had reviewed Schedules 1 before they were filed, the Debtor stated that she could not remember exactly, "but I'm sure I did. . . .I mean I think I did." (Transcript at 56).  When asked the same question by Mr. Spotswood on cross-examination, the Debtor stated that "I'm sure I signed them."  (Transcript at 64).  However, when questioned by her attorney, Mr. McGee, at her Rule 2004 examination, the Debtor denied that she had reviewed her schedules and denied that she had signed the schedules.[26]

In his Rule 2004 examination, Mr. Spotswood also testified as to the differences between the Debtor's two sets of schedules.  Mr. Spotswood testified:

Q.  And on the first schedules, [Pass Christian is] listed as being unencumbered, and on the second schedules it is listed as being encumbered by a secured claim in the amount of $25,000.

A.  That's correct.

Q.  Do you know why the secured [claim] wasn't listed on the first schedules?

A.  I would put down the information that my client provided me.  And at that time, with regard to the first [schedules], she claimed that she didn't have any encumbrances.  And on the second [schedules] she actually told me that she had $25,000 and that she was upside down on the Pass Christian.  And if you notice on

---

[26]Transcript at 57-58.  Trial Exhibit 1, *Rule 2004 Exam of Patricia L. Smith,* pp. 122-24.

the Front Street – and I think there is another one in here too – that she did the same thing.

Q.  Do you know why she didn't tell you about the lien?

A.  No.  I do not know.

Q.  Okay.  And you wouldn't have any idea why it wasn't disclosed on the first schedules?

A.  No, other than the fact that she – I only put down the figures that she actually provided to me.[27]

As to the remaining previously undisclosed deeds of trust on the Debtor's properties, Mr. Spotswood's testimony was the same:  his client did not tell him about the deeds of trust when he prepared Schedules 1, but she told him about the deeds of trust when he was preparing the Schedules for her Second Petition.

The chart below shows when the various deeds of trust were executed and when they were recorded with the chancery clerk's offices.

See Next Page

---

[27]Trial Exhibit 14, *Deposition of Robert Lewis Spotswood*, pp. 10-11.

| DEEDS OF TRUSTS Submitted into Evidence | | | | |
|---|---|---|---|---|
| **Property Exhibit #** | **Date Executed** | **Date Recorded** | **Pre-Petition** | **Post-Petition** |
| Pass Christian Henderson Ave. Trial Exhibit #2 | 06/08/2012 | 09/26/2013 | | ✔ (both cases) |
| Pascagoula Front St. Trial Exhibit #3 | 06/08/2012 | 09/26/2013 | | ✔ (both cases) |
| Chotard Chotard Landing Trial Exhibit #4 | 09/06/2011 | 01/24/2013 | ✔ (5 days prior to First Petition) | |
| Greenville Hwy. 1 S Trial Exhibit #5 | 11/05/2012 | 01/24/2013 | ✔ (5 days prior to First Petition) | |

At her Rule 2004 Examination, the Debtor was questioned about the why the deeds of trusts were recorded years after she had executed the deeds of trust. The Debtor testified that she did not have any knowledge as to when the deeds of trust were recorded or why the deeds of trust were recorded when they were.[28]

At trial, Woodruff's attorney, Travis T. Vance, Jr., testified as to why the deeds of trust were not recorded shortly after they were executed. Basically, he blamed his secretaries for failing to have the deeds of trust recorded:

> [T]he first one that I'm looking at is the property located in Issaquena County which is Chotard Landing property. It was executed on the 6th day of September, 2011, notarized by my secretary on the 6th day of September, 2011 and filed for record on February 24, 2013. And I can explain the reasons why it was not filed on the 6th day of September, 2011. It was because I had two new secretaries and when they were placed in the file to be sent off the secretaries were new, didn't know where to send

---

[28]Trial Exhibit 1, *Rule 2004 Exam of Patricia L. Smith,* pp. 26-7.

them and they got refiled back in the office files and didn't get filed until Rodney reminded me of it and I then pulled them out and sent them off for filing. They were executed on September 6th of 2011 and they were filed on February 24th of 2013 on this deed of trust. It was my fault. I'm responsible for filing this deed of trust, I know that. I was delinquent in not getting the deed of trust off and it's totally my fault and I done that. But when I discovered it I sent it off for filing. I didn't know there was a problem with it, and I didn't see any problem with it so I sent it off and filed it.[29]

As to the remaining three (3) deeds of trust (Pass Christian Lot, Pascagoula Lot and Greenville Property), Mr. Vance's testimony as to why these deeds of trust were filed of record years after they were executed is the same as his testimony as to the Chotard Landing property–it was the fault of his secretaries. *See* Transcript at 123-126.

## 2. Checking Account

The Debtor admitted that she was the president and sole member of a company called Advanced Modular Homes & Developments, LLC. (Advanced Modular). The Debtor testified that Advanced Modular had not been in business since around the time of Hurricane Katrina (August of 2005). The Debtor further testified that she individually shared a joint checking account with Advanced Modular (Advanced Modular Account). (Transcript at 34).

The Debtor admitted that she did not disclose the Advanced Modular Account in her Schedules: "Q. And only one checking account was disclosed on your schedules, correct? A. Yeah, my personal. That's what I thought I had to disclose was personal." (Transcript at 35).

## 3. Rental Property and Income

Each version of the Debtor's schedules lists a property located at 612 Magnolia Drive, Destin, Florida (Magnolia House). At the trial, the Debtor was questioned about the Magnolia

---

[29]Transcript at 122-23. While Mr. Vance stated that the deed of trust on the Chotard Landing property was recorded on February 24, 2013, the certificate of the chancery clerk on the front of the deed of trust states that the deed of trust was filed on January 24, 2013. (Trial Exhibit 4).

House.  While there was/is apparently some dispute as to what ownership interest the Debtor has in the Magnolia House (*see* Transcript at 75-76), the Debtor admitted that she received rental income from the Magnolia House and that she failed to disclose the rental income on her Schedules:

> Q.  And you rented this property to third parties before and after the bankruptcy was filed, correct?
>
> A.  I have rented it to pay for repairs and stuff, yes.
>
> Q.  And do you recall how you were compensated?
>
> A.  What do you mean?
>
> Q.  Was it in cash?
>
> A.  Yeah, it was in cash.
>
>     . . . .
>
> A.  Because it didn't, the money didn't come to me.  Stone Source rented the house out and was repaid for the repairs that they had done on the house.
>
> Q.  Okay.  And Stone Source is a stone and marble company?
>
> A.  Yes.
>
>     . . . .
>
> Q.  And [Stone Source] didn't own the property, correct?
>
> A.  No.  No. . . . Stone Source didn't own the property, no.
>
> Q.  Okay.  I would next like to turn your attention to Schedule I in the second set of schedules.  Now Item 8 requests a debtor to disclose income from real property.  Do you see Schedule I?
>
>     . . . .
>
> Q.  And you listed zero, correct?
>
> A.  Correct.

Transcript at 28-9.

E. L. "Skip" Lloyd also testified about the Magnolia House.  Mr. Lloyd is a Certified Public Accountant who has been working for Woodruff and for Stone Source.  Mr. Lloyd testified that the Debtor had received approximately $90,000.00 in rental income from the Magnolia House.  Of that number, Mr. Lloyd testified that the Debtor had received approximately $60,000.00 after she had filed bankruptcy.  (Transcript at 101).

### 4.  Potential BP Settlement Claims

On *Schedule B – Personal Property* (Dkt. #11-2) (Schedule B), line 21, the Debtor lists as a contingent and unliquidated claim "Possible BP Settlement"[30] Claim.  The Debtor lists the current value as "Unknown."[31]  At trial, the Debtor disclosed that there are two separate potential claims: her claim in her individual capacity and a claim of Stone Source, her wholly owned corporation.  Both of these claims were against BP Exploration & Production, Inc. (BP) and were pending at the time she filed her bankruptcy petitions.  (Transcript at 67).

As for her individual claim against BP, the Debtor testified that "[m]ine is in the Appeals Court, the Fifth Circuit something or other, you know, and it's – and I'm never getting anything on mine." (Transcript at 68).  She further testified that the same attorneys who handled Stone Source's BP claim, the law firms of Herman Herman & Katz and Travis Vance, were also handling her personal claim. (Transcript at 68).

Within two (2) months of the filing of the Debtor's Second Petition, in August of 2013, Stone Source received a check in settlement (BP Settlement) of its lawsuit against BP.  (Transcript at 30-31).  The Debtor testified that a week or two before Stone Source received the check, she had been

---

[30]*Schedule B – Personal Property*, Case No. 1301920EE, Dkt. #11-2, p. 2 of 3, July 3, 2013.

[31]*Id.*

informed that Stone Source would be receiving a settlement from BP.  (Transcript at 68-69).

Trial Exhibit 6 is a copy of the *Form 1099-Misc* Stone Source received from the BP Economic and Property Damages Settlement Trust.  The gross settlement[32] was $460,549.35.[33]  After a deduction for fees and expenses, Herman Herman & Katz issued a check in the amount of $357,644.48 made payable to Stone Source and dated August 15, 2013.[34]

The Debtor testified that the BP Funds were deposited into Travis Vance's trust account. The Debtor stated that Stone Source gave the entire BP Funds to Woodruff because of money loaned by Woodruff to Stone Source over the years.  However, the Debtor testified that she did not have knowledge of what the loans were or how much money Woodruff had put into Stone Source.  She stated that as Stone Source's accountant, Mr. Lloyd would have that information.  (Transcript at 66-67).

Mr. Lloyd testified that the loans from Woodruff to Stone Source were not on Stone Source's books at the time the loans were made.  He also testified that he was not aware of any loan documents nor had he seen any documents to evidence any of the loans.  (Transcript at 98-99; Transcript 114-15).  As to who would receive Stone Source's BP Funds, Mr. Lloyd testified that "[i]t was agreed that [Woodruff] would get the check to repay him for prior loans."[35]

Mr. Vance testified that it was his understanding that any money Stone Source received from

---

[32]According to Mr. Lloyd, Stone Source had received prior disbursements from BP.  In 2010 and 2011, Stone Source received approximately $74,900.00 in BP Settlement funds.  Trial Exhibit 12, *Deposition of E. L. "Skip" Lloyd,* pp. 101-02.

[33]Trial Exhibit 6.

[34]Trial Exhibit 7.

[35]Transcript at 110.

its claim against BP would go to Woodruff to repay Woodruff for the money he had given to Stone Source over the years. (Transcript 131-33). However, Mr. Vance testified that there were no written documents evidencing this agreement: "No, I don't have anything in writing, but I had a verbal commitment from the owner of Stone Source before I ever got involved in the BP claim, I had that agreement with her that those monies we received from the Stone Source *(sic)* would be repaid to Rodney Woodruff." (Transcript at 133).

Once the funds were deposited into Mr. Vance's trust account, checks were written from that account to the Debtor, Stone Source and Advanced Modular. Mr. Vance testified that "[e]very check that was written out of my trust account was written at the direction and instant *(sic)* and instruction of Rodney Woodruff." (Transcript at 132).

Trial Exhibit 8 is a composite exhibit of checks written from Mr. Vance's trust account. Trial Exhibit 8 contains copies of the following checks:

See Next Page

| PAYABLE TO: ADVANCED MODULAR | |
|---|---|
| Date: | Amount: |
| 08/20/2013 | $10,000.00 |
| 09/03/2013 | $15,000.00 |
| 10/01/2013 | $15,000.00 |
| 10/31/2013 | $5,000.00 |
| 12/10/2013 | $10,000.00 |
| **TOTAL:** | **$55,000.00** |

| PAYABLE TO: STONE SOURCE | |
|---|---|
| Date: | Amount: |
| 08/20/2013 | $10,000.00 |
| 09/17/2013 | $5,000.00 |
| 11/20/2013 | $10,000.00 |
| 12/18/2013 | $20,000.00 |
| 01/31/2014 | $10,000.00 |
| 02/10/2014 | $15,000.00 |
| 02/21/2014 | $5,000.00 |
| 03/05/2014 | $15,000.00 |
| 03/19/2014 | $10,000.00 |
| **TOTAL:** | **$100,000.00** |

| PAYABLE TO: DEBTOR | |
|---|---|
| Date: | Amount: |
| 11/17/2013 | $5,000.00 |
| **TOTAL:** | **$5,000.00** |

Trial Exhibits 9, 10 and 11 are copies of bank statements.  Trial Exhibit 9 is a composite exhibit of bank statements dated June 7, 2013, to July 9, 2014, of the Advanced Modular/Debtor's bank account (Advanced Modular Bank Statements).  Trial Exhibit 10 is a composite exhibit of bank statements dated June 1, 2013, to June 30, 2014, of Stone Source (Stone Source Bank Statements).  Trial Exhibit 11 is a composite exhibit of bank statements dated May 16, 2013, to July 16, 2014, of the Debtor, Woodruff and Bridget Hughes-Anderson[36] (Personal Bank Statements).  At the trial, the Debtor was questioned extensively about the checks written from the trust account, about the Advanced Modular Bank Statements, and about the Stone Source Statements.

---

[36]The Debtor's daughter.

25

## i. Advanced Modular Bank Statements[37]

The attorney for Trustmark asked the Debtor about the five checks written from Travis Vance's trust account to Advanced Modular and the corresponding deposits shown on the Advanced Modular Bank Statements. The Debtor acknowledged that the five trust checks and the deposits into the Advanced Modular account correlated. (Example, Transcript at 37-38).

In addition, the Debtor was asked about transfers and withdrawals from the Advanced Modular bank account. The exchange below is typical of the Debtor's responses to all questions regarding debits and transfers shown on the Advanced Modular Bank Statements:

> Q. Okay. Now I'd like to look at some of the withdraws that were made from the Advance Modular account for that same month after this money from the Travis Vance account was deposited. These withdraws, are these personal, for personal use? I believe the first one is for Stein Mart in Madison, Mississippi.
>
> A. Yeah, I don't know if it's personal or business. I mean I assume -- I'm not sure.
>
> Q. Okay. I'd like you to take a look at the transaction on September 3rd. It was a transfer to another checking account ending in number six five four two for $500. Do you see that?
>
> A. Yes, sir.
>
> Q. Okay. That's -- and it was for $500. Now that's your personal checking account, correct?
>
> A. Yes, sir, it is.
>
> Q. Okay. And I'd also like you to take a look at the last two transfers from this account were also both to your personal bank account, is that correct?
>
> A. Yes, sir.

---

[37]At the trial, Advanced Modular is called *Advance* Modular, and at other times, *Advanced* Modular. According to the web site of the State of Mississippi's Secretary of State, the official name of the corporation was Advanced Modular.

Q.  And one was for $1200, is that correct?

A.  Yes, sir.

Q.  And the last one was for $1,000, is that correct?

A.  Yes, sir.

Q.  Okay.

A.  But it's mine and my husband's checking account.  I'm not exactly sure, you know, my personal is mine and my husband's.

> Q.   Okay.   There are just a few more on this Advance Modular exhibit that I'd like to go through.   The next one would be the statement for the month of September through October 2013 and it should be the next tab on your copy. Okay.  Now the deposits for this month you'll see on October 1 there was a deposit into the Advance Modular account for $15,000, is that correct?

A.  On when now?

Q.  I believe it should be highlighted on your copy.  But there was a deposit made into the Advance Modular account on October 1st for $15,000, is that correct?

A.  Okay, well I must have a different -- I must be on a different one.

Q.  It's the statement for September 7th through October 8th, 2013.

A.  Okay, yeah, 10/1.

Q.  Okay. So you do see that deposit into this account for $15,000?

A.  Yes, sir.

Q.  Okay.  Now if you'll turn back to the checks you'll see on, this exhibit's actually numbered, you'll see on Page 14 a check from the Travis Vance attorney-at-law account to Advanced Modular for $15,000 on October 1, 2013, correct?

A.  Yes, sir.

Q.  Okay. So this check was deposited in this account on October 1?
A.  Yes, sir, it looks like it.

27

Q.  Okay.  Now if we look at the withdraws for this period can you identify any business withdraws or is this all personal purchases and transactions?

A.  No, it's business also because right there on the very first one it says Stone Connection.

Q.  Okay.  Is this Mimmo's Ristorante a business purchase?

A.  I'm not sure if that's business or I'm not sure.

Q.  Is this September 11th purchase at Winn-Dixie Liquor a business purchase?

A.  Sounds like a personal.

Q.  What about the next purchase down at Outback in Destin, Florida?

A.  I'm not sure because I mean we carried people out to eat lunch a lot of times, you know, I don't know.  I'm not for sure of that to this date.  I'm not sure.

Q.  But Advance Modular isn't doing business currently, correct?

A.  No.

Q.  Okay.  Now there is one transfer from this account for this pay period I want to take a look at it and it was on September 13 to checking account ending in the number 6542 for $500.  That's to your personal account, correct?

A. Yes, sir.

(Transcript 38 to 41).

In reviewing the Advanced Modular Bank Statements, there are debits from grocery stores, fast food restaurants, clothing stores, liquor stores, drug stores, restaurants, service stations, dollar stores, and television shopping channels.  In addition, there are transfers of funds to the Debtor's personal bank account, Stone Source's bank account, and unidentified bank accounts. (Trial Exhibit 9).

When questioned by her attorney, the Debtor testified that she did not know she was using the Advanced Modular debit card.  Instead, she stated that she believed she was using the Stone

28

Source debit card.  (Transcript at 63).  However, when questioned by the Trustee, the Debtor acknowledged she knew which card she was using:

> Q.  Okay.  So you were aware when you were using Advanced Modular debit card to purchase stuff that you were using Advanced Modular's card, correct?
>
> A.  Well, I think – yeah, I think I knew what I was using, yes, sir.
>
> Q.  Okay.  So at all points in times when you used a card to either get personal or non-personal things you were aware of which card you were using and which account it was using?
>
> A.  Yes, sir.

(Transcript at 87).

### ii.  Stone Source Bank Accounts

As for the Stone Source Bank Statements, the Debtor was questioned about the deposits, transfers, and debits shown on the bank statements.  The Debtor was questioned about the nine checks written from Travis Vance's trust account to Stone Source and the corresponding deposits shown on the Stone Source Bank Statements.  The Debtor acknowledged that the trust checks and the deposits into the Stone Source account correlated.  (Example, Transcript at 45).

As for the transfers and debits shown on the bank statements, the exchange below is typical of the Debtor's responses:

> Q.  Okay. And looking at the withdraws and transactions made for this period can you identify any business transactions that Stone Source made?
>
> A.  I'm not sure if these are Stone's I mean or personal or business.  I'm not sure because I mean.  Like the Vista Print I know that's business.  I mean I'm not sure if it's personal or business.
>
> Q.  Is this McGuire's Irish the first --
>
> A.  That could be carrying somebody to lunch. I mean we always did -- we always carried people to lunch.

Q.  What about on August 15th the Venus Nails?

A.  August the 15th.

Q.  In Madison, Mississippi.

A.  No, I don't think that would be business.

Q.  Okay. What about these purchases made August 19th and 20 in New Orleans, are these personal or business?

A.  That's probably business. That's probably when we were going down there on the BP claim about the BP claim.

Q.  Okay. This Funky Pirate purchase, Bourbon, Orleans, these are business purchases?

A.  I would say they're business purchases because it had to be when we were down there on the BP claim.

Q.  What about Terra Nova Wine in Madison, Mississippi?

A.  That don't sound like that would be.

Q.  Okay.  Now if you look on that first page of the statement on August 8th there was a transfer to your personal checking account for $500, correct?

A.  When was that?

Q.  August 8th.

A.  Yes, sir.

Q.  And on August 13th there was another transfer to your personal checking account for $500, is that correct?

A.  Yes, sir.

Q.  And on August 21 there was another transfer to your personal checking account for $3500?

A.  Yes, sir.

Q.  And on August 28th there was a transfer to your personal checking account for

$500?

A. Yes, sir.

Q. Okay. I'd like to point your attention to the statement for August 31 to September 30th, 2013. And on September 18th there was a deposit into the Stone Source account for $5,000, is that correct?

A. Yes, sir.

Q. Did that come from the Travis Vance trust account?

A. I'm not sure.

Q. You'll see on Page 15 of the checks exhibit a check made from the Travis Vance trust account to Stone Source for $5,000 on September 17th, 2013, is that correct?

A. Yes, sir.

Q. So this money that was deposited in the Stone Source account on this date was from the Travis Vance trust account?

A. Yes, sir.

Q. Okay. And on September 3rd you transferred or Stone Source transferred into your personal account $300?

A. Yes, sir.

Q. And on September 23 Stone Source transferred into your personal checking account $4,000?

A. Yes, sir.

Q. Okay. Now are these purchases -- are there personal purchases listed here as well? For example the Winn-Dixie Liquor on September 6th?

A. I think all the liquor stores will be personal.
Q. Can you identify any business transactions for this period?

A. That Vista Print again is definitely. The Cease Fire (phonetic). I mean -- I mean there is business ones on there.

Q. Are there also personal purchases too?

A.  I mean some of them look like they may be personal purchases, yeah.

Q.  Venus Nails on September 25th?

A.  Well not necessarily. Let's see, when was this? In thirteen.

Q.  September 25.

A.  I'm not sure.

(Transcript 46 to 48).

In reviewing the Stone Source Bank Statements, there are debits from grocery stores, fast food restaurants, clothing stores, liquor stores, drug stores, restaurants, service stations, dollar stores, hair salons, and an anti-aging clinic.  In addition, there are transfers to the Debtor's personal bank account, Advanced Modular's bank account, and unidentified bank accounts.

Unlike Advanced Modular's bank account, there does appear to be some debits on Stone Source's Bank Statements that could be legitimate business expenses.  For example:  Waste Management, Vista Print, U.S. Post Office, and paint stores.  However, the vast majority of the debits appear to be personal transactions.  (Trial Exhibit 10).

When questioned, the Debtor at one point stated that she could not answer questions about all of the charges because she was not the only person who had debit cards for the Stone Source account:

A.  I can't answer all of these [questions] because I'm not the only one on this account, you know, I mean other people had cards.

Q.  Who else uses the Stone Source [account]?

A.  I know but I mean it's we have an office card and we have – Bridget has a card, you know, Rodney has a card.  So I can't answer all of these charges.

Q.  So is Bridget Anderson your daughter?

A.  Uh-huh, she is.

Q.  And she uses the Stone Source bank account?

A.  Yeah.

Q.  And Rodney Woodruff also uses the Stone Source bank account?

         . . . .

A.  He has a – he has a card.  No, he's not an officer.

(Transcript at 54-55).

## D.  Summary

As noted above, when the Debtor filed her petition on June 21, 2013, and when she filed amended schedules on July 11, 2013, she listed secured debts in the amount of $1,841,716.60.  In an attempt to reduce her secured debt, the Debtor filed a Motion to Amend in an attempt to surrender five pieces of real property (Dkt. #106) to Woodruff, her husband.

Even though an order was never entered allowing the modification, the Court finds that this purported surrendering of property was a sham.  The Debtor was "surrendering" the property to her husband so that the Debtor would be below the debt limits.  Consequently, on the date she filed her Chapter 13 petition, the Debtor did not qualify to be a debtor under Chapter 13 pursuant to § 109(e). Because she exceeded the debit limits of § 109(e), the Court finds this shows bad faith as it is an attempt by the Debtor "to abuse the spirit of the Bankruptcy Code."[38]

In *Investors Group, LLC v. Pottorff*, 518 B.R. 380 (N.D. Tex. 2014), the debtor was involved in a derivative lawsuit in another forum.  On the eve of an important deposition, the debtor filed bankruptcy.  The court found that the debtor was not being pressured by creditors and that it was bad faith for the debtor to file bankruptcy in an attempt to gain an advantage in a derivative lawsuit

---

[38] *In re Resendiz,* 2013 WL 6152921, at *4.

33

in another forum. *Id.* at 384. (*See also, In re Alexandra Trust*, 526 B.R. 668, 680 (Bankr. N.D. Tex. 2015)(In lifting the automatic stay, the court found that it was bad faith to file bankruptcy as a litigation tactic.).

Like the *Pottorff* case, the Debtor did not file bankruptcy because she was being pressured by her creditors. Instead, Stone Source was being pressured by its creditor, Trustmark. As shown by Trial Exhibit 13, the Debtor attempted to use the filing of her personal bankruptcy petition to halt the foreclosure sale of property owned by Stone Source. The Court finds that it was bad faith for the Debtor to use her personal bankruptcy case in an attempt to stop the foreclosure sale of Stone Source's property.

As for the Debtor's schedules, Trustmark has shown that the Debtor filed misleading or inaccurate schedules in an attempt to conceal the Advanced Modular bank account; to conceal the rental income she received from the Magnolia House; and to conceal the existence of the two BP lawsuits she had pending at the time she filed bankruptcy.

In considering the deeds of trust to Woodruff, the Court did not find the testimony in regard to the amount of the indebtedness to Woodruff; the testimony regarding the failure to list the deeds of trust in the First Petition; and the testimony regarding the failure of the deeds of trust to be recorded at the time they were executed to be convincing.

The Court is unsure if misrepresentations were made regarding the deeds of trust or if an unfair manipulation of what debt is owed by the Debtor has occurred. Regardless of what has occurred, once the case is converted to a Chapter 7, under the *strong-arm powers* given to a Chapter 7 trustee under § 544, "the trustee has the rights of a bona fide purchaser of real property 'without regard to any knowledge of the trustee or of any other creditor' and without regard to 'whether or

not such a creditor or purchaser exists.'"[39]  Section 549 would then give the Chapter 7 trustee the

authority to avoid any of the deeds of trust filed after the filing of the Debtor's petition.[40]  The

Chapter 7 trustee could also seek to determine if any grounds might exist to avoid any transfer or

obligation pursuant to § 548.

With regard to the BP lawsuits, once the Debtor found out in late July 2013 or early August

2013, and most certainly at the time she received the check on or about August 15, 2013, the Debtor

had a duty to disclose that her wholly owned company, Stone Source, had received the BP Funds.

"'The duty of disclosure in a bankruptcy proceeding is a continuing one, and a debtor is required

to disclose all potential causes of action.' *Youngblood Group v. Lufkin Fed. Sav. & Loan Ass'n,* 932

F.Supp. 859, 867 (E.D. Tex. 1996)."[41]

Not only did the Debtor fail to disclose that her "possible BP Settlement claim" had become

a certainty, the Debtor hid the funds when she authorized the BP Funds to be deposited into Mr.

Vance's trust account.  While the Debtor testified that she had given the BP Funds to Woodruff to

repay him for money he had loaned Stone Source, the Debtor failed to produce any evidence to

support her position that Woodruff had made loans to Stone Source.

The evidence shows that $55,000.00 was funneled through the bank account of Advanced

Modular for the Debtor's personal use.  While the Debtor testified that some of the transactions were

---

[39]*Garringer v. GMAC,* No. 06-3021, 2006 WL 3519342, at *2 (Bankr. W.D. Mo. Dec. 5, 2006).

[40]*Id.*

[41]*Roden v. Synergy Tech. Inc.,* 525 B.R. 620, 626, (W.D. La. 2015).  *See also, In re Coastal Plains, Inc.,* 179 F.3d  197, 208 (5th Cir. 1999)(debtor has a duty to disclose if it has enough information to know that it may have a possible cause of action); *Love v. Tyson Foods, Inc.,* 677 F.3d  258, 260 (5th Cir. 2012)(debtor was estopped from bringing Title VII claim because he failed to disclose it in his bankruptcy); *In re Adams,* 481 B.R. 854, 858 (Bankr. N.D. Miss. 2012)(debtor had a continuing duty to disclose wrongful death action).

business related, the Court finds that to be disingenuous. The Debtor testified that Advanced Modular had not conducted any business in almost ten (10) years,[42] therefore, Advanced Modular could not have transactions on its bank account that are for business purposes.

In addition, BP money ($100,000.00) was funneled through Stone Source's bank account for the Debtor's personal use and benefit. As noted, while some of the debits on the Stone Source Bank Statements could arguably be related to Stone Source's business, the vast majority of the debits appear to be for the Debtor and her relatives' personal use.

The Court finds that the Debtor's failure to disclose that she had received over $300,000.00 in BP Funds and that her spending of the BP Funds on personal expenses through the Advanced Modular and Stone Source bank accounts amounts to "evidence of misrepresentation, unfair manipulation, or other inequities."[43]

Additionally, the Debtor has been in bankruptcy for almost two years. While she testified that she wanted to pay her creditors in full,[44] she has yet to file a viable plan that provides for Trustmark's proof of claim which was filed for $816,905.12. The amended plan the Debtor filed on January 27, 2014, (Dkt. No. 108) provides to pay her unsecured creditors in full, but the Debtor bases this 100% payment on unsecured claims totaling only $322,815.00. Further, if the Debtor's Motion to Dismiss is granted, there is no guarantee that any of the Debtor's creditors will be paid anything.

As noted above, in order to prevail on its Motion to Convert, Trustmark has the burden of

---

[42]Transcript at 24.

[43]*In re Resendiz,* 2013 WL 6152921, at *4.

[44]Transcript at 69.

proving that this is an extraordinary case and that the Debtor's actions were atypical and resulted in bad faith. The Court finds that Trustmark has met this burden and overwhelmingly proven that the Debtor's actions were atypical and resulted in bad faith. Like the debtors in *Marrama* and *Jacobsen,* Trustmark has shown that the Debtor filed "misleading and inaccurate schedules that attempted to conceal assets from creditors."[45] Further, in examining all of the facts and viewing the totality of the circumstances, the Court finds that the Debtor's plan as proposed was not reasonable; that by her actions, the Debtor has abused the spirit of the Bankruptcy Code; that the Debtor has misrepresented and/or manipulated her schedules; and that the Debtor has no intention to pay her creditors in full. Consequently, pursuant to § 1307(b), the Court finds bad faith exists and that it is in the best interest of the Debtor's creditors that the Debtor's case is converted to a Chapter 7.

## Conclusion

In *Jacobsen*, *supra* note 14, at 8, the Fifth Circuit held that a debtor does not have an absolute right to dismiss when a motion to convert is pending. The Fifth Circuit found that before ruling on the debtor's motion to dismiss its case, a court must first determine if bad faith exists to convert the case to a Chapter 7.

As the Supreme Court noted in *Marrama*, "[t]he Court notes that the Bankruptcy Code is intended to give a 'fresh start' to the 'honest but unfortunate debtor.'"[46] In the case at bar, Trustmark has clearly shown that the Debtor is not an *honest but unfortunate* Debtor. Trustmark has shown that the Debtor concealed assets, misrepresented her assets, filed misleading schedules, and abused the spirit of the Bankruptcy Code. In examining the facts and evidence presented at trial

---

[45]*In re Jacobsen,* 609 F.3d at 663.

[46]*Marrama,* 549 U.S. at 381. (citations omitted).

and considering the totality of the circumstances, the Court finds that bad faith exists. Consequently, the Debtor's Motion to Dismiss should be denied, and Trustmark's Motion to Convert should be granted.

A separate judgment consistent with this Opinion will be entered in accordance with Rule 7054 and Rule 9021 of the Federal Rules of Bankruptcy Procedure.

**##END OF OPINION##**